UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
KENNETH CUNNINGHAM,

**SECOND AMENDED COMPLAINT**

**17 cv 5124 (DLC) (AJP)**

**ECF Case**

Plaintiff,

vs.

The CITY OF NEW YORK,
NEW YORK CITY POLICE OFFICERS
STEVEN BAIO, ALFONSO MENDEZ,
SERGEANT PERRY QUINCOSES, and
JOHN DOE,                                                          **JURY TRIAL DEMANDED**
in their individual and official capacities,

Defendants.

-------------------------------------------------------------x

Plaintiff Kenneth Cunningham, by his attorney, Cyrus Joubin, complaining of the

Defendants, respectfully alleges as follows:

### PRELIMINARY STATEMENT

1.   This civil rights action arises from the false arrest and malicious prosecution of

Kenneth Cunningham ("Plaintiff"), who was trying to protect himself from his violent,

menacing, drug-ravaged brother when police officers arrested him for unlawful eviction.

Plaintiff asserts constitutional claims pursuant to 42 U.S.C. § 1983 ("Section 1983")

against the individual defendants for false arrest, malicious prosecution, denial of the

right to a fair trial, failure to intervene, and a *Monell* claim against the City of New York

for the same constitutional violations.  Plaintiff seeks compensatory and punitive

damages, costs, disbursements, and attorney's fees pursuant to applicable state and

federal civil rights law.

1

## JURISDICTION

2.   This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 and the Fourth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (4), this being an action seeking redress for the violation of Plaintiff's constitutional and civil rights.

## VENUE

3.   Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because the acts complained of occurred in this district.

## JURY DEMAND

4.   Plaintiff respectfully demands a trial by jury on each and every one of his claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

## PARTIES

5.     The individually named defendants Police Officer Steven Baio (Shield # 18830) ("PO Baio"), Police Officer Alfonso Mendez (Shield # 7899) ("PO Mendez"), and Sergeant Perry Quincoses (Shield #5441) ("Sgt. Quincoses"), and Police Officer John Doe ("PO Doe") (collectively, the "individual defendants") are and were at all times relevant herein officers, employees and agents of the New York City Police Department ("NYPD").

6.     On the date of the incident giving rise to this complaint, the individual defendants were assigned to the NYPD 32nd Precinct.

7.     Each individual defendant is sued in his individual and official capacity.  At all times mentioned herein, each individual defendant acted under the color of state law,

in the capacity of an officer, employee, and agent of defendant City of New York ("Defendant City").

8.      Defendant City is a municipality created and authorized under the laws of New York State.  It is authorized by law to maintain, direct, and to supervise the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

## STATEMENT OF FACTS

9.      On April 29, 2016, around 11:45 a.m., Plaintiff was in his apartment (the "Apartment") on the first floor of 2588 7th Avenue in Harlem, New York City.

10.      Earlier that day, Plaintiff's brother – Larnell Cunningham ("Larnell") (also known as "Leonel") – told NYPD officers from the 32nd Precinct that Plaintiff wasn't allowing him into the Apartment.

11.      When Larnell made this report, he was incoherent and intoxicated.

12.      Moreover, when Larnell made this report, there was a warrant (the "Warrant") for his arrest and he was wanted for arrest by the 32nd Precinct.

13.      The reason for the Warrant – and for being wanted by the 32nd Precinct – was that on April 13 and 25, 2016, Larnell deliberately broke the windows of the Apartment while Plaintiff was inside, and Plaintiff reported this criminal behavior to the 32nd Precinct.

14.      After Plaintiff reported Larnell's criminal behavior to Sgt. Quincoses of the 32nd Precinct on April 25, 2016, Sgt. Quincoses assured Plaintiff that there was a "warrant" for Larnell's arrest and that Larnell would be arrested once the police found him.

15.     Beyond Larnell's breaking windows, prior to April 29, 2016, Larnell had also assaulted and threatened Plaintiff.

16.     Specifically, Larnell repeatedly threatened to cut Plaintiff's face and to burn down the Apartment, making Plaintiff feel unsafe in his own home.

17.     Prior to April 2016, Larnell was criminally prosecuted for committing crimes against Plaintiff.

18.     For instance, in 2014, Larnell was criminally charged with assaulting Plaintiff and violently poking him in the eyes, bursting blood vessels in Plaintiff's eyes.

19.     As a result of Larnell's criminal behavior, Plaintiff had an order of protection issued in his favor against Larnell.

20.     Larnell had repeatedly violated orders of protection issued against him in favor of Plaintiff.

21.     And so, when Larnell lost his keys to the Apartment in early April 2016, Plaintiff did not go out of his way to give his drug-fiending, dangerous, menacing brother access to the Apartment.

22.     After Larnell broke the Apartment window the second time (April 25, 2016), Sgt. Quincoses from the 32nd Precinct told Plaintiff that Larnell was wanted for arrest, and Sgt. Quincoses instructed Plaintiff to inform his Apartment building's management company of Larnell's behavior.

23.     When Plaintiff informed the management company of Larnell's criminal behavior, the management company recognized the danger Larnell posed, changed the locks of the Apartment, and told Plaintiff not to give Larnell access to the Apartment.

24.     After Larnell made his eviction complaint on April 29, 2016, PO Baio and PO Mendez went to the Apartment around 11:45 a.m., accompanied by Larnell.

25.     When Plaintiff opened the door for the two officers, they informed him of Larnell's complaint.

26.     Plaintiff informed the officers of Larnell's history of criminal behavior towards him, including Larnell's violence, threats, and window-breaking.

27.     Larnell admitted to the window-breaking in the officers' presence, saying in sum and substance:  "I smashed his windows cuz he wouldn't let me in."

28.     Plaintiff also informed Officers Baio and Mendez about the existence of the Warrant for Larnell's arrest and how Sgt. Quincoses told him that Larnell was wanted for arrest and should be arrested once he came into contact with the NYPD.

29.     Plaintiff also said that he had copies of the NYPD Domestic Incident Reports from April 13 and April 25 that documented Larnell's criminal behavior.

30.     After hearing Plaintiff's side of the story, PO Baio and PO Mendez spoke with Sgt. Quincoses to verify the existence of the Warrant and/or the fact that Larnell was wanted for arrest based on his criminal mischief against Plaintiff.

31.     Sgt. Quincoses confirmed that Larnell was wanted for arrest because of his dangerous window-breaking behavior.

32.      Soon thereafter, Sgt. Quincoses came to the Apartment, accompanied by PO Doe.

33.     When Sgt. Quincoses arrived at the Apartment building at 2588 7th Avenue, he saw Larnell in the hallway outside the Apartment, and PO Baio and PO Mendez identified Larnell to Sgt. Quincoses.

34.     Plaintiff recognized Sgt. Quincoses as the sergeant he had spoken to after the criminal mischief incidents in April, and he reiterated to Sgt. Quincoses Larnell's history of violence and criminality as well as Larnell's threats to cut his face and burn down the Apartment.

35.     When Sgt. Quincoses arrived at the scene, Larnell was in the hallway of the Apartment building behaving deranged, high on the dangerous street drug Molly (also known as MDMA), appearing sick and out of his mind, and carrying copious amounts of illegal drugs.

36.     Because Sgt. Quincoses had first-hand knowledge of Plaintiff's fear of Larnell, understood the legitimacy of that fear, saw that Larnell appeared deranged and intoxicated, and because he knew Larnell was supposed to be arrested based on Plaintiff's complaints, Sgt. Quincoses instructed PO Baio and PO Mendez to arrest Larnell.

37.     Larnell was handcuffed and searched, and his pharmacopeia of narcotics was discovered by the individual defendants.

38.     Absurdly, because Larnell kept saying he had a right to live in the Apartment, Sgt. Quincoses asked Plaintiff if he would let Larnell into the Apartment.

39.     This was an absurd request, of course, because Larnell was arrested and had no present right to be free, let alone live in Plaintiff's Apartment.

40.     Moreover, it is customary for a full order of protection to be issued against defendants when they are charged with deliberately destroying the property of people known to them; in other words, defendants must stay away from the victims of the property damage as well as from the victims' homes.

41.     Plaintiff correctly explained that he should not have to permit a person into his Apartment if by doing so he would be placed in imminent danger.

42.     Larnell said nothing to refute Plaintiff's statements regarding his criminality, dangerousness, ill intent, and violence.

43.     In fact, Larnell continued to admit in Sgt. Quincoses' presence that he broke the Apartment's windows on two occasions that month.

44.     Plaintiff further explained that, following Sgt. Quincoses' advice, he contacted the building's management company, which changed the Apartment locks and instructed him not to give the Apartment keys to his brother.

45.     Plaintiff also explained his host of health problems to the individual defendants, and made it clear that the presence of a violent, unhinged, drug-fiending person was a threat to both Plaintiff's safety and health.

46.     The individual defendants knew, or should have known, that any possible rights Larnell had in the Apartment were issues for a Housing Court judge to decide.

47.     Plaintiff explained to the defendant officers that he was named on the Apartment's lease, paid all the Apartment's bills, and was the only person responsible enough to maintain and upkeep the Apartment.

48.     Plaintiff offered to show the individual defendants documentation showing his rightful claim to the Apartment, including utility bills and the lease.

49.     Sgt. Quincoses told Plaintiff that he wanted to see these documents, and he entered the Apartment so that Plaintiff could show him these documents.

50.     While Sgt. Quincoses was in the Apartment, PO Doe stood in the doorway and kept the Apartment door open.

51.     Inside the Apartment, Sgt. Quincoses handcuffed and arrested Plaintiff for the "unlawful eviction" of Larnell.

52.     Plaintiff committed no crime in the individual defendants' presence, and he did nothing wrongful or suspicious in their presence.

53.     PO Baio and PO Mendez remained with Larnell in the building while Sgt. Quincoses handcuffed Plaintiff and brought him outside the Apartment.

54.     After Plaintiff's arrest, the defendant officers transported the handcuffed Larnell along with the handcuffed Plaintiff to the 32nd Precinct.

55.     There, Plaintiff was booked and processed, detained and searched, fingerprinted and photographed.

56.     At the Precinct, the individual defendants discussed what charges and information to present to the New York County District Attorney's Office (the "DA") regarding Plaintiff.

57.     PO Baio was designated as Plaintiff's arresting officer and was tasked with completing the paperwork for Plaintiff's arrest and submitting information regarding Plaintiff's alleged criminal behavior and arrest to the DA.

58.     PO Baio – with the knowledge and approval of the other defendant officers – presented to the DA a misleading narrative of Plaintiff's act of "unlawful eviction" without mentioning the most important facts:  that the "victim" of the eviction was a violent and unhinged criminal who had threatened Plaintiff and who was, at the time of Plaintiff's arrest, under arrest for committing criminal mischief against Plaintiff.

59.     After being booked and processed at the precinct, Plaintiff was transported to Central Booking in lower Manhattan, where he waited additional hours in holding cells before his arraignment.

60.     Plaintiff was arraigned in New York County Criminal Court, charged under Docket Number 2016NY027724 with violating New York City Administrative Code Section 26-521(a)(3) – Unlawful Eviction – an unclassified Misdemeanor.

61.     The criminal court complaint ("Complaint") was sworn to and signed by PO Baio.

62.     According to the Complaint:  "On or about April 29, 2016 at about 11:45 A.M., inside 2588 7th Avenue, the defendant [Plaintiff] evicted…the occupant of a dwelling unit who has lawfully occupied the dwelling unit by engaging…in conduct which prevented…the occupant from the lawful occupancy of such dwelling unit…."

63.     The Complaint continues:  "I [PO Baio] am informed by Leonel [Larnell] Cunningham…that [Larnell] has lived in [the Apartment] for…a period of time greater than 30 days…. I am further informed that when [Larnell] came home, he found that his locks were changed and he could not enter the apartment… I observed the defendant [Plaintiff] open the door to [the Apartment].  The defendant then stated in substance that he would not let [Larnell] into the apartment and that [Larnell] could not get a key to the apartment."

64.     Ignorant of who the "victim" of Plaintiff's alleged eviction was – ignorant that Plaintiff was actually the victim of Larnell's violent and menacing behavior – the DA requested that bail be set for Plaintiff.

65.    Following the DA's recommendation, the Criminal Court Judge at Plaintiff's arraignment set bail in the amount of $1000 bond or $500 cash.

66.    Plaintiff remained incarcerated for an additional day and a half before he was released on bail.

67.    Meanwhile, Larnell was prosecuted for Criminal Mischief and possession of controlled substances.

68.    In connection with Larnell's prosecution, an order of protection was issued against him to stay away from Plaintiff and the Apartment.

69.    Because Plaintiff suffers from numerous health issues, his incarceration caused him major anxiety and fear as he dreaded what would happen to him if he could not take his medication.

70.    The unlawful eviction prosecution against Plaintiff was dismissed on May 5, 2016 on the DA's motion.

71.    The DA dismissed the prosecution against Plaintiff because it realized that the charges were baseless.

**NYPD's CULTURE OF MENDACITY**

72.    The NYPD failed to supervise and discipline the individual defendants despite their histories of malicious and mendacious behavior, ignoring the risk that they would engage in future misconduct, thereby encouraging them to continue to abuse their powers and violate the rights of civilians.

73.    There is a systemic failure by the City to identify, discipline, and supervise NYPD officers who fabricate criminal charges, a failure so widespread, obvious, and tolerated as to constitute a custom and policy of Defendant City.

74.     The NYPD's flaccid response to lying officers – particularly in the context of filing false charges – constitutes a destructive custom and policy that fosters a culture of mendacity in the NYPD.

75.     The City has recognized the obvious and significant problem of police officers fabricating criminal charges, but there is no serious mechanism in place by which to curb such conduct or weed out dishonest officers.

76.     The NYPD has no internal programs – not even rudimentary statistical software – that enable it to assess whether a particular Officer has an unusually high number of allegations of making false statements.

77.     Proportionate and appropriate discipline sends a message to NYPD officers that they are not above the law and are accountable to the people whom they serve.

78.     But NYPD officers usually face only minor discipline or no discipline whatsoever for making false statement on court documents.

79.     The Civilian Complaint Review Board ("CCRB") has no jurisdiction to investigate allegations of fabricated statements by NYPD officers in criminal court documents.  Investigating, controlling, and punishing this type of wrongdoing is the responsibility of the NYPD.

80.     In 1995, by Executive Order No. 18, Defendant City's Mayor created the Commission to Combat Police Corruption (the "Commission") to monitor and evaluate the NYPD's anti-corruption activities.  The Commission fulfills its mandate to monitor the NYPD's performance by reviewing the investigations of the Internal Affairs Bureau ("IAB"), and presenting its findings in its Annual Report.

81.     Since its inception, the Commission has emphasized the importance of

appropriately disciplining officers who make false statements.  On the basis of the

Commission's recommendations, the NYPD has adopted a False Statement Policy (*see*

NYPD Patrol Guide Section 203-08) that mandates termination of officers who

intentionally make false official statements regarding a material matter, unless

exceptional circumstances exist.

82.     As the Commission stated in its 2013 Annual Report, "Consistent application

of the false statement policy is of utmost importance.  It not only enables members of the

service to know what they can expect if they make false statements, but it also sends a

clear message to members of the service, as well as the public, that the Department will

not tolerate such conduct" (pg. 74).

83.     The Commission analyzes false statements in official criminal court

documents, including supporting depositions, criminal court complaints, summonses, and

affidavits.  False statements in such documents are of paramount importance because

they have the potential to unjustly deprive citizens of their civil liberties and to destroy

the lives of innocent people.

84.     Despite the importance of appropriately identifying and punishing officers

who make false statements, the NYPD rarely imposes discipline consistent with its stated

policy of terminating officers.

85.     Indeed, the gap between its practice and policy is so wide as to make the

NYPD's False Statement Policy a sham.

86.     For example, in the 2014 Annual Report, the Commission examined ten cases

involving false statements in sworn court documents; in seven of those cases, the subject

officers were found guilty but not separated from the police department.

87.     Such findings – which expose the gap between the NYPD's False Statement Policy and practice – can be found in virtually every Annual Report issued by the Commission.

88.     Over the past ten years, in its Annual Reports, the Commission has analyzed numerous forms of false statements and has consistently found that the NYPD "fail[s] to follow its false statement policy; "fail[s] to charge the subject officer with making a false statement although such a charge appear[s] appropriate"; levies "other similar charges…to avoid the imposition of the False Statement Policy's requirement of termination"; and creatively skirts the requirement of termination without justification. And there is no sign of improvement.

89.     In the specific context of fabricated court documents that falsely accuse people of wrongdoing, the Commission has regularly found grossly inadequate punishments, resulting in guilty officers forfeiting vacation days (usually no more than 30 days) but rarely losing their jobs.

90.     To make matters worse, the instances of false statements analyzed by the Commission is a small fraction of the total instances of false statements that occur within the NYPD.

91.     In the 2010 Annual Report, for instance, the Commission identified only ten IAB cases that included allegations of making an official false statement.

92.     The officers who were caught fabricating statements were unlucky – they were captured on videotape, a civilian reported them, their lies were unwittingly exposed – but most dishonest police officers know they can lie or mislead and get away with it.

93.     The number of false statement cases investigated by the IAB in the specific

context of court documents is a very small portion of the actual number of instances of material fabrication in court documents.

94.     Defendant City has turned a blind eye to the tens of thousands of criminal cases which are dismissed each year in the Criminal and Supreme Courts of Defendant City; has failed to study how many of those dismissals were due to baseless, fabricated charges; and has failed to proactively look for patterns of fabrication and identify charges that should have never been brought.

95.     Defendant City has no system by which to proactively identify mendacious officers.  It waits for civilians to bring such officers to its attention.

96.     In the ten years prior to April 29, 2016, the number of NYPD investigations into police officers making false statements on criminal court accusatory instruments that did not arise from civilian complaints was *zero*.

97.     In a criminal justice system where numbers and statistics have become paramount, the inadequacy of the NYPD's supervision and discipline with respect to dishonesty in the filing of criminal charges is exacerbated by the pressure on police officers to meet arrest quotas, or "performance goals," which pressure officers to arrest people and file charges unlawfully, a pressure not tempered by adequate safeguards that protect innocent citizens from being wrongfully arrested and charged.

98.     Because arrests are rewarded, while making false arrests and fabricating charges go largely unpunished, police officers have felt incentivized to engage in false arrests and to fabricate criminal charges.

99.     Such perverse incentives become particularly destructive in the hands of dishonest, undisciplined, unsupervised officers.

100.     Through the data cited herein along with public events (e.g. numerous civil rights lawsuits alleging fabrication every year, ticket-fixing scandals, evidence of an illegal quota system, to name a few) and other information in its possession, the policymakers of Defendant City have been aware of the NYPD's practice of insufficiently punishing – and thereby encouraging – the filing of fabricated and baseless criminal charges.

101.     By doing nothing about this practice, the City has demonstrated deliberate indifference to the rights of its citizens.

102.     Unfortunately, under Mayor Bill de Blasio's administration, the NYPD seems more empowered than ever to thumb its nose at the False Statement Policy.

103.     In its 2015 Report, the Commission found that the Department rarely brought charges under the False Statement provision.  "Instead," the Commission writes, "the Department used other Patrol Guide sections to allege misconduct relating to false statements" (pg. 103), sections which do not carry a presumption of termination.

104.     The notion of police officers lying, cheating, fabricating, manipulating, and misleading has become so accepted and commonplace within the NYPD that the pursuit of justice, which is rooted in truth and fact, has become subverted and degraded.

105.     While the vast majority of police officers are decent people, they must operate in a police culture so truth-sick and cynical that their morale is crushed.

106.     NYPD officers see firsthand how roguish behavior is rewarded, trust thwarted, and virtue perverted within their ranks.  The negative incentives created by this sick culture threaten the safety, welfare, and liberty of every citizen.

**DELIBERATE ACTS UNDER COLOR OF STATE LAW**

107.    All of the aforementioned acts of Defendants, their agents, servants and employees, were carried out under the color of state law.

108.    All of the aforementioned acts deprived Plaintiff of the rights guaranteed to citizens of the United States by the Fourth Amendment and Fourteenth Amendments of the Constitution of the United States of America, and in violation of 42 U.S.C. § 1983.

109.    The individual defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments of the United States Constitution.

**DAMAGES**

110.    As a direct and proximate cause of the said acts of the Defendants, Plaintiff suffered the following injuries and damages:

        a.   Violation of his constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution;

        b.   Severe emotional trauma, distress, degradation, and suffering.

**SECTION 1983 CLAIMS**

**FIRST CLAIM**

**Denial of the Right to a Fair Trial Under Section 1983**

111.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein

112.    By the actions described, the Defendants deprived Plaintiff of his right to a fair trial under the Fourteenth Amendment.

113.    The individual defendants deliberately withheld crucial information from the Manhattan District Attorney's Office (namely, the fact that the complaining witness was a violent and detained individual who had no right to live in the Apartment during the alleged "eviction"), the omission of which would have influenced a jury's decision.

114.    As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## SECOND CLAIM

### False Arrest Under Section 1983

115.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

116.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

117.    By the actions described above, Defendants deprived Plaintiff of his federal civil rights, including his Fourth Amendment right to be secure in his person against unreasonable searches and seizures, specifically his right to be free from false arrest.

118.    As detailed above, the individual defendants intentionally arrested and detained Plaintiff without probable cause, without a warrant, without privilege or consent.

119.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## THIRD CLAIM

### Malicious Prosecution Under Section 1983

120.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

121.    By the actions described, the Defendants deprived Plaintiff of his Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically his right to be free from malicious prosecution.

122.    Without probable cause, the individual defendants maliciously and actively initiated a baseless criminal proceeding against Plaintiff.

123.    The prosecution terminated in Plaintiff's favor when all charges against him were dismissed.

124.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FOURTH CLAIM

### Failure to Intervene Under Section 1983

125.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

126.    Each and every individual defendant had an affirmative duty to intervene on Plaintiff's behalf to prevent the violation of his constitutional rights by other law enforcement officers.

127.    The individual defendants failed to intervene on Plaintiff's behalf to prevent, end, or truthfully report the violations of his constitutional rights despite knowing about such violations and having had a realistic opportunity to do so.

128.    Specifically, individual defendants Baio, Mendez, and Doe failed to intervene to prevent, end, or truthfully report the false arrest of Plaintiff by Sgt. Quincoses.

129.    The individual defendants Quincoses, Mendez, and Doe failed to intervene to prevent, end, or truthfully report the misleading allegations presented by PO Baio to the DA.

130.    As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiff sustained the damages and injuries hereinbefore alleged.

## FIFTH CLAIM

### Municipal Liability Under Section 1983

131.    Plaintiff realleges and reiterates all allegations set forth in the preceding paragraphs as if stated fully herein.

132.    By the actions described, the Defendant City deprived Plaintiff of his Constitutional rights through its failure to train, supervise, and discipline malicious and mendacious officers; and through its fostering a culture of abuse and dishonesty among those who wield considerable power over the lives of everyday citizens.

133.    As a direct and proximate result of the acts of Defendant City, Plaintiff sustained the other damages and injuries hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands the following relief jointly and severally against the Defendants:

a.    An order awarding compensatory damages for Plaintiff Kenneth Cunningham in an amount to be determined at trial;

b.    An order awarding punitive damages in an amount to be determined at trial;

    c.      A court order, pursuant to 42 U.S.C. § 1988, that Plaintiff is

entitled to reasonable attorney's fees, costs and disbursements; and

    d.      Such other and further relief as this Court may deem appropriate.


DATED:    December 12, 2017          _____s/_____
             New York, New York         CYRUS JOUBIN, ESQ.
                                     43 West 43rd Street, Suite 119
                                     New York, NY 10036
                                     (703) 851-2467
                                     joubinlaw@gmail.com
                                     **Attorney for Kenneth Cunningham**